IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANGELA WEST,

   Plaintiff,

vs.             No. CIV 03-589 JB/WDS

GALE NORTON, Secretary, United
States Department of the Interior,

   Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment,

filed April 12, 2004 (Doc. 24). The primary issue is whether a genuine issue of material fact exists

with respect to the Plaintiff Angela West's discrimination and retaliation claims against the Defendant.

The Court held a hearing on this matter on July 15, 2004. Because the Court finds that West has not

demonstrated that any genuine issue of material fact exists requiring a trial on any of her claims, the

Court will grant the Defendant's Motion for Summary Judgment and dismiss West's claims.

## FACTUAL BACKGROUND

This case arises out of a series of events that occurred during West's employment with the

Defendant.[1] Between January, 1999, and October, 2001, the Department of the Interior, Bureau of

---

[1] At the hearing on the Defendant's Motion for Summary Judgment on July 15, 2004, the West's counsel informed the Court that he had not yet filed his exhibits in opposition to the motion. The Court accepted an oral motion to submit those exhibits and instructed the Defendant to file a response to that motion. The Defendant did not file a Response, so the Court granted West's oral motion on August 30, 2004. See Order, filed August 30, 2004 (Doc. 41). As of October 21, 2004, however, West's counsel has not filed his exhibits in opposition to his motion. The Court must, therefore, consider only the exhibits attached to the Defendant's motion as part of the record, and will not consider unsupported facts that West in her briefing or during the oral hearing on the motion.

Land Management ("BLM"), employed West as an Outdoor Recreation Planner, level GS-13. <u>See</u> Declaration of Rita Montoya ¶ 5, at 2 (executed April 8, 2004)(hereinafter "Montoya Decl."). West's official duty station was at the BLM's Santa Fe office. <u>See</u> Deposition of Angela West at 81:25 to 82:1 (taken January 14, 2004)(hereinafter "West Depo.").

In September, 1999, the BLM hired Carsten Goff to serve as the Deputy State Director for the BLM's Santa Fe office. <u>See</u> Declaration of Carsten Goff ¶ 1, at 1 (executed April 9, 2004)(hereinafter "Goff Decl."). Between September, 1999 and August, 2000, Goff was West's immediate supervisor. <u>See id.</u> ¶ 2, at 1. In August, 2000, the BLM hired Gary Johnson to serve as Goff's assistant, and Johnson became West's immediate supervisor. <u>See id.</u> West disputes this fact, alleging that Goff continued his supervisory responsibility and active role in supervising West. <u>See</u> Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, ¶ 2 at 1-2, filed May 6, 2003 (Doc. 34)(hereinafter "Response"). According to West, Johnson continued to confer with Goff on all significant personnel decisions, and took most, if not all, of his directions from Goff in regard to personnel decisions. <u>See id.</u> West, however, offered no evidence to support this assertion because West's counsel did not file exhibits in support of the opposition to Defendant's motion.

During the relevant time period, Richard Whitley served as the BLM's Associate State Director, and Michelle Chavez served as the State Director. <u>See</u> Goff Decl. ¶ 1, at 1. Whitley was Goff's immediate supervisor. <u>See id.</u>

## I.   <u>HOSTILE WORK ENVIRONMENT CLAIMS.</u>

West alleges that Goff created a hostile work environment by: (i) providing oral and written criticism about her to management, to peers, and to her during formal Employee Performance Plan

and Results Report ("EPPRR") sessions;[2] and (ii) communicating with her in a manner that was often hostile, punitive, loud, and angry.  See Complaint for Damages for Sex Discrimination and Retaliation ¶ 7(a) at 3, filed May 16, 2003 (Doc. 1)(hereinafter "Complaint").

West was not present when Goff allegedly orally criticized her to management personnel.  See West Depo. at 77:22-25.  Goff would tell West that he had spoken with management and had told them, for example, that she had missed deadlines.  See id. at 78:1-24; id. at 79:6-21.

West contends that Goff also criticized her in a number of written documents.   See West Depo. at 45:22 - 57:4.  These documents included: (i) a Letter of Reprimand that Goff issued to West at 1 (August 14, 2000)("Letter of Reprimand"); (ii) a Letter of Concern that Johnson issued to West at 1 (dated January 22, 2001)("Letter of Concern"); (iii) two e-mails and one handwritten note from Johnson to Whitley (dated September 10, 2001, September 11, 2001, and October 25, 2001, respectively); and (iv) an e-mail from Johnson to West (October 24, 2001).  See id.  Of these written communications, the Letter of Reprimand and the Letter of Concern occurred before West sought Equal Employment Opportunity ("EEO") counseling.  See Montoya Decl. ¶ 9, at 4 (stating that West requested EEO counseling on August 16, 2001); Letter of Concern at 1; Letter of Reprimand at 1).

West also alleges that Goff criticized her in front of her peers.  See West Depo. at 88:11 - 89:25.  West contends that Goff was frequently "hostile or punitive or kind of nasty" to her during staff meetings.  Id. at 88:11-13.  At one staff meeting, when West leaned over to say something to the person seated beside her, Goff asked whether West had something to say or share with the group.  See West Depo. at 88:14 - 89:12.  West characterizes Goff's manner of speaking to her on this

---

[2] EPPRR sessions are mid-year and year-end employee performance reviews conducted by supervisory personnel.

occasion as hostile and nasty.  See id. at 88:12 - 89:16.  On another occasion, Goff pointed out that

West had missed a meeting.  See id. at 89:17-21.  In her response, West contends that Goff's hostile

demeanor was apparent and that Goff did not address male employees in the same fashion.  West

failed, however, to support this allegation by offering any exhibits into evidence.  West's deposition,

therefore, is the only evidence supporting Goff's demeanor at this meeting.  West also alleges that,

at one point, Goff made a statement to the staff via e-mail that the recreation group, which is West's

program, had not been represented at a staff meeting.  See id. at 87:13-25.  West contends that this

was an oral criticism because, although true, Goff did not mention other people who were also absent

from the meeting.  Again, because West did not introduce any exhibits into evidence, her testimony

is the only evidence in the record to support this contention.

West attended two EPPRR sessions in 2000 and two sessions in 2001.  See West Depo. at

91:1-5; Declaration of Gary L. Johnson ¶ 3, at 1 (executed April 9, 2004)(hereinafter "Johnson

Decl.").  West alleges that, during the 2000 mid-year EPPRR session, Goff responded in a hostile

manner when West brought up the issue of workload.  See West Depo. at 92:21 - 94:19.  West

contends that, at the 2000 mid-year EPPRR session, Goff acted "cranky" and raised his voice at her.

Id. at 96:1 - 97:5.  Goff acknowledges that he, at times, may have raised his voice "in an effort to

make my point[,]" but he denies that he ever yelled or screamed at West.  See Goff Decl. ¶ 4, at 2.

Despite West's allegations that Goff criticized her work in the EPPRR sessions, there is no evidence

in the record supporting any criticism occurred in the 2000 end-of-the-year EPPRR session. See BLM

Letter at 1(dated May 10, 2002); West Depo. at 97:6-21 (stating that the session occurred, but not

providing any information regarding the allegation of criticizing her work).

In 2001, West's mid-year EPPRR occurred in May, and her year-end EPPRR session

occurred in October.  See Johnson Decl. ¶ 3, at 1. Again, despite the allegations that Goff critized

her work during these sessions, there is no evidence in the record to support this contention.

Moreover, despite the alleged criticisms during the EPPRR sessions, the sessions for the 2000 - 2001

period were fully successful.  See Goff Decl. ¶ 4, at 2.

Goff denies ridiculing or intimidating West when providing feedback and/or criticism to West.

See id.

## II.   DISPARATE TREATMENT CLAIMS.

West alleges that she was the victim of disparate treatment when: (i) her supervisors assigned

her the duties of a male BLM employee, Dave Mensing, who moved to the BLM Washington office

in March, 2000, and Goff denied her repeated requests to be relieved of those duties; (ii) in June,

2000, Goff denied her permission to attend a conference in Spain; (iii) in August, 2000, Goff issued

her a Letter of Reprimand; (iv) in January, 2001, Johnson issued her a Letter of Concern; (v) in

March, 2000, her supervisors denied her request to attend a financial training course; (vi) she was not

allowed to attend meetings; and (vii) she was required to submit a weekly report regarding her

whereabouts.

### A.   ASSIGNMENT OF ADDITIONAL WORK.

On March 9, 2000, a fellow employee, Dave Mensing, left the Santa Fe office.  See Goff Decl.

¶ 5, at 2.  Because Mensing's departure coincided with Goff starting as a new supervisor, on or

around March 9, 2000, West volunteered to assume some of Mensing's duties.  See West Depo. at

110:3-9.  According to West, however, she communicated that she was willing to only accept the

additional work for a limited period -- "a few months . . . while [the office] was in transition."  Id.

at 110:12-15.

On July 17, 2000, West requested relief of Mensing's duties, which was denied.  See id. at 114:23-24.  According to the BLM's letter of investigation, West submitted numerous verbal and eight written requests to be relieved of the additional workload.  See BLM Letter at 1-2.  The last of these requests occurred on August 1, 2001.  See id.  All of her requests to be relieved from the additional duties were denied.  See West Depo. at 140:12-14.

At no time between March, 2000, and October, 2001, was West required to work in excess of forty hours per week or more than eighty hours per pay period.  See Goff Decl. ¶ 7, at 2-3.

West did not seek EEO counseling within 45 days of the denial of each request, with the exception of the meeting on August 1, 2001.  See Montoya Decl. ¶ 8, at 3-4.

**B.      DENIED PERMISSION TO TRAVEL TO SPAIN.**

On or about May 25, 2000, BLM's International Program Coordinator, Joyce Fierro, submitted a Foreign Travel Certification Form to the agency, requesting permission to attend the V Congresso Internacional Camineria Hispanica conference in Valencia, Spain from July 17, 2000 through July 22, 2000 to present a seven page paper.  See Goff Decl. ¶ 8, at 3.  The projected cost for attendance was $5,013.00.  See id.

On June 5, 2000, Goff signed the Foreign Travel Certification Form that Fierro submitted.  See id.  Goff alleges that, at the time the he approved the form, he did not realize he approved travel to Spain for, not only Fierro, but for West and a community volunteer as well.  See id.  After signing the form, Goff spoke with Whitely and Chavez, who informed Goff that approving three persons to travel to Spain to present a relatively short paper was financially irresponsible considering the "tightness" of BLM's budget.  See id.  Whitely and Chavez instructed Goff to cancel the trip for West and the community volunteer, and to only approve Fierro for the trip for Spain.  See id.  Accordingly,

-6-

on June 16, 2000, Goff told West that she could not attend the conference in Spain.  See id.  In her

Response, West contends that the Defendant's description of this conversation -- that Goff

"informed" West -- is not accurate and that, instead, Goff spoke to West in a "loud, hostile and

punitive manner."  Response ¶ 35, at 3.  Again, other than her testimony and the allegations contained

her response, West offers no evidence in the record to support this assertion.  See Response, ¶ 35 at

3.  More over, West alleges that Goff never mentioned the conversation with Whitely and Chavez;

instead, Goff denied ever having given permission for the trip.  See id. at 9.  West alleges that this

discrepancy creates a credibility question that a jury must resolve.  See id.

West did not initiate EEO counseling within 45 days of being told that she would not be able

to travel to Spain for the conference.  See West Depo at 130:2-3.

### C.    LETTER OF REPRIMAND

On August 14, 2000, Goff issued West a Letter of Reprimand for credit card

delinquency/abuse.  See Letter of Reprimand from Carsten Goff (dated August 14, 2000).  In the

letter, Goff informed West that she was "officially reprimanded for delinquency on [her] U.S.

Government Master Card."  Letter of Reprimand at 1.  Goff states that, although Goff spoke with

West approximately two weeks before, and West assured Goff that she would bring her account up

to date, as of August 14, 2000, a substantial balance remained overdue.  See id. at 1.  Goff also

makes reference to the fact that this was West's second problem with credit card delinquency; in

response to the first occurrence, in 1999, Goff sent West a letter of counseling.  See id.  Goff further

explains the reason for taking the action of compiling the Letter of Reprimand, including

consideration of West's "past work record, the seriousness of the offense and its effect upon [West]

to effectively perform the duties [Goff has] assigned [West]."  Id.  Goff also provides that, if West

-7-

believed the reprimand was not justified, West could submit a grievance through the appropriate procedures.  See id. at 2.  In August, 2000, Goff also issued a Management Order restricting West's use of her government-issued credit card.  See Goff Decl. ¶ 9, at 3-4.

West believes that the issuance of the letter was discriminatory in that she thought that other males had committed similar delinquency with their government-issued credit cards, but did not receive a Letter of Reprimand.  Other than her testimony, West, however, offers no evidence to support this allegation.  See West Depo. at 82:19 - 83: 7.  West does not present the names of the other males that received different treatment, or any other evidence of similarly situated males to which the Court could compare Goff's conduct.  In its reply, the Defendant refers to West's testimony in which she allegedly stated that she received a computer print out identifying two male employees whose accounts were also delinquent, and that to her knowledge they were not issued Letters of Reprimand.  See Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, filed June 22, 2004 (Doc. 38)(hereinafter "Reply").  Neither the Defendant or West included this testimony in an exhibit, and, therefore, it is not part of the record before this Court.

West did not initiate EEO counseling with 45 days after receiving the Letter of Reprimand.  See id. at 83:21- 84:8.

**D.      LETTER OF CONCERN**

On January 22, 2001, Johnson issued a Letter of Concern to West.  See Johnson Decl. ¶ 2, at 1; Letter of Concern from Gary Johnson at 1 (dated January 22, 2001).  In the letter, Johnson expressed his concern about West's lack of presence at the Santa Fe office, her assigned duty station.  See id.  Johnson indicated that West spent more time in Albuquerque at the BLM office or at

meetings because, as West communicated to Johnson, it was more convenient to West because she lived in Albuquerque.  See id.  Johnson stated in the letter that West's absence was of concern because he was unable to locate her whereabouts on several occasions, which negatively impacted the office's work.  See id.  He also noted that her absence at the Santa Fe office had negative consequences because West missed numerous meetings at which her presence was needed.  See id. Finally, Johnson noted that, although West contended that adverse weather conditions prevented her from reporting to the Santa Fe office, other employees in similar situations use alternatives other than reporting to another office when the weather prevents them from traveling to Santa Fe, such as annual leave.  See id.

For those given reasons, Johnson required West to report to the Santa Fe office for at least eighty-percent of her work time.  See id.  Under these instructions, West was able to attend meetings in Albuquerque for twenty-percent of the time, subject to a supervisor's approval.  See id.

The Defendant alleges that the letter is not a form of discipline and does not constitute an adverse employment action.  See  Johnson Decl. ¶ 2, at 1.

The record shows that West did not seek EEO counseling within 45 days of receiving the letter, because the letter was dated on January 22, 2001, and she first sought EEO counseling on August 16, 2001.  See Letter of Concern at 1; Montoya Decl. ¶ 8, at 3-4.

### E.     DENIAL OF PERMISSION TO ATTEND TRAINING COURSE

In the Motion for Summary Judgment, Defendant asserts that another incident upon which West relies is that, in March, 2000, she was denied a request to attend a financial training course.  See Defendant's Motion for Summary Judgment, ¶ 25 at 5; Reply ¶ 5, at 6; Transcript of Motion for Summary Judgment Hearing at 6:1-3; 13:16-24.  West did not address this incident in her response,

nor did she expand upon this incident at the hearing.  The only other reference to training courses the Court could find in the record is in the BLM letter, stating that West alleged to the EEOC that her supervisor held her to a different standard of behavior and performance than her male peers.  <u>See</u> BLM Letter at 2.  The letter then lists "criteria for the approval of training requests" as an example of this alleged disparate treatment.  <u>Id.</u>  The Court, therefore, can rely only on the limited information provided by the Defendant in regard to this occurrence.

### F.     WEST BEING PROHIBITED FROM ATTENDING MEETINGS

West alleges that the Management Order that Goff issued in August, 2000, prevented her from attending various meetings.  <u>See</u> West Depo. at 153:10-25.  In addition, West contends that Goff denied her permission to attend an inter-governmental conference for Northern NM and Communities, which was scheduled on June 12, 2001 at 8:30 a.m.  According to Goff, he required her to attend a BLM Resource Advisors meeting, scheduled at 9:00 a.m. the same day as the conference.  <u>See</u> Goff Decl. ¶ 10, at 4.  Goff explains that he instructed her that her attendance at the Resource Advisors meeting was necessary so she could present her report on her program.  <u>See</u> Goff Affifavit (dated June 27, 2002).  Goff also alleges that he told West that she could join the conference following the conclusion of the BLM Resource Advisor meeting.  <u>See</u> <u>id.</u>  Goff alleges that requiring her attendance at the BLM Resource Advisor meeting did not cause West to miss the conference altogether, but instead only delayed her arrival.  <u>See</u> <u>id.</u>

According to Goff, if a Program Advisor had a conflict with a BLM Resource Advisors meeting, the employee could either attend or have another Program Advisor represent their program at the meeting.  <u>See</u> <u>id.</u>  This policy, according to Goff, applied equally to male and female employees.  <u>See</u> <u>id.</u>  West alleges that it was not uncommon for other employees to miss a staff meeting when

-10-

other conflicts existed in their schedule.  <u>See</u> Response at 11.  To support this contention, however, West refers to two sworn interviews that she did not attach as exhibits.  <u>See id.</u>  Moreover, in the record before the Court, there are no names of other employees -- or details of any instances -- in which Goff treated other employees differently.

West did not initiate EEO counseling within 45 days of when Goff denied her permission to attend this, or another other, meeting.  <u>See</u> Montoya Decl. ¶ 8, at 3 (noting that West did not seek EEO counseling until August 16, 2001).

### G.     WEEKLY STATUS REPORT

West also alleges that Johnson discriminated against her when he required her to submit weekly status reports, detailing her whereabouts for the upcoming week.  <u>See</u> West Depo. at 150:5-21; 152:5-4.  Johnson also required that she be in phone or email contact at all times.  <u>See id.</u> at 6-8.  According to West, this was discriminatory in that no other male workers had to submit a similar report.  <u>See id.</u> at 150:8; 152:19 - 153:4.  Although there is nothing in the record memorializing the arrangement and explaining the details thereunder, there is evidence that Johnson had expressed concern about West's absence from the Santa Fe office and not being able to reach her on several occasions.  <u>See</u> Letter of Concern at 1.

In her response, West alleges that "the weekly report detailing her activities was never imposed on any other male employee during the time of Ms. West's employment with the New Mexico BLM."  West, however, offers no evidence to support this allegation.

West did not seek EEO counseling within 45 days of the imposition of the weekly status report requirement.  <u>See</u> West Depo. at 153:5-9.

### III.     <u>AVAILABILITY AND USE OF EEO COMPLAINT PROCEDURES.</u>

On August 16, 2001, West asked for an EEO counselor assignment.  See Montoya Decl. ¶ 8, at 3-4.  On December 21, 2001, West filed an EEO complaint with the BLM's EEO office.  See id. ¶ 9, at 4.  On May 10, 2002, the BLM's EEO office wrote a letter to West advising her of the issues that had been accepted for investigation.  See EEO Response Letter (dated May 10, 2002).  The BLM's EEO office informed West that, if she was not satisfied with the accepted issues as stated, she was free to submit a statement to the office within five calendar days of her receipt of the letter.  See id. at 2.  West declined to submit a letter objecting to the EEO office's characterization of her claims.  See West Depo. at 43:14-23.  West testified at her deposition that the letter contained an accurate summary of her claims.  See id. at 43:3-8.

Before filing her EEO complaint, West had, over a two year period, met four or five times with Rita Montoya, a BLM EEO Specialist.  See id. at 10:23-25; id. 12:15-16.  West does not recall the specific dates when she met with Montoya, nor does she remember the details of each conversation.  See id. at 12:10-14; id. 12:20 to 13:6.  West's conversations with Montoya generally concerned Goff's style of communication and West's frustrations resulting therefrom.  See id. at 15:3-12.  During at least several of those meetings, Montoya advised West of her rights under Title VII, and she offered West the opportunity to engage in pre-complaint counseling.  See id. at 15:13 to 16:24; Montoya Decl. ¶ 7, at 3.  Each time, West declined to initiate any formal procedures, stating that she preferred to work through her issues with Goff on her own.  See Montoya Decl. ¶ 7, at 3; West Depo. at 15:10-12; id. at 16:21-24.  West told Montoya that, as a former supervisor, she was familiar with the EEO complaint and grievance procedures.  See Montoya Decl. ¶ 5, at 2-3.

One of the meetings with Montoya took place in the BLM EEO Manager's office.  See id. ¶ 6, at 3.  During that meeting, Montoya provided West with an EEO/Merit Systems Protection

Board/Grievance packet, which contained, among other things, a brochure concerning the procedures for filing EEO complaints; a brochure regarding the discrimination complaint process for federal sector employees; a sexual harassment brochure; and a notice describing the time frames for initiating contact with an EEO counselor.  See id.  After discussing these materials, Montoya again asked West whether she wanted to be assigned to an EEO counselor.  See id.  Again, West declined, telling Montoya that she preferred to deal with the problem herself.  See id.

Between 2000 and 2001, the BLM had in place policies providing for equal employment opportunity within the agency.  See id. ¶ 4, at 2.  During that same time, the BLM had a zero tolerance policy in effect prohibiting discrimination and sexual harassment in the work place.  See id. These policy statements were posted and readily available to all employees.  See id.  The BLM also posted notices in each of its field offices advising employees of the procedures and time frames for pursuing claims of discrimination.  See id.  Those time frames and procedures were also available on the BLM New Mexico web page.  See id.  The BLM's New Mexico state office also provided EEO training on an annual basis for all employees, addressing, among other things, the EEO complaint process, mediation, sexual harassment, and hostile work environment.  See id.

## IV.  **RETALIATION CLAIMS.**

West alleges that Goff and others at the BLM illegally retaliated against her for bringing forward her formal and informal complaints about Goff's discrimination.  See Complaint ¶ 9, at 4.

West presents four incidents which she contends evidence retaliation; all of these events occurred after West sought EEO counseling on August 16, 2001.  First, West alleges that Whitley threatened to block her requested transfer to the Washington, D.C. office.  See West Depo. at 174:7-9.  West supports this contention with her testimony that Goff told her that Whitely was going to

block her appointment.  See id.  West did not speak to Whitely about whether he attempted to block her transfer to the Washington, D.C. office.  See id. at 175:11-14.  In November 2001, the BLM reassigned West to the BLM's Washington, D.C. office.  See West Depo. at 8:9-11.

Second, West contends that Johnson retaliated against her by ordering her early return from a conference in Farmington.  West alleges she was harassed for not returning from Farmington soon enough, but she concedes she was not disciplined for her actions.  See id. at 179:19 - 180 :2.  Third, West asserts that Whitley proposed issuing, but never filed, a letter of subordination against West. See id. at 174:1-25.

Lastly, West alleges that Johnson made disparaging remarks about West to one of her prospective supervisors, Bob Ratcliff, in the Washington D.C. office.  See id. at 177:7-17.  West, however, has not spoken with Ratcliff about this alleged communication between Johnson and Ratcliff.  See id. at 177:18-21.  Instead, West contends that "a couple people" in the Washington, D.C. office, although she could not remember whom, told her that Johnson had made disparaging remarks about West to Ratcliff.  See id. at 177:22 - 178:13.  After transferring to the Washington, D.C. office, West's first two evaluations have been positive.  See id. at 179:5-11.  Johnson asserts that he never made disparaging remarks about West to Ratcliff.  See Johnson Decl. ¶ 6 at 2.

**STANDARDS FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT**

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To avoid summary judgment, the non-moving party must contradict facts that the movant specifically avers.  See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).  The court must deny a motion for summary judgment when a

genuine issue of material fact remains to be tried, or where the moving party is not entitled to a judgment as a matter of law.  See Kennedy v. Silas Mason Co., 334 U.S. 249, 252 (1948).

The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. at 323.  The moving party can meet this burden by the moving party by highlighting to the court an insufficiency of evidence as to an essential element of the nonmovant's claim.  See id.  Once met, the burden shifts to the nonmoving party to present specific, admissible facts from which a rational trier of fact could find for the nonmovant.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. at 324).  The non-moving party may not rest on his pleadings but must set forth specific facts. See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). Under rule 56(e), only statements made with actual knowledge will support a motion for summary judgment; the court must disregard statements of mere belief.  See Tavery v. United States, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)(citations omitted).

For the purposes of summary judgment, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  If "the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff," the court should deny summary judgment.  MacDonald v. Eastern Wyoming Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991)(quoting Palucki v. Sears, Robueck & Co., 879 F.2d 1568, 1570 (7th Cir. 1989)).

The court should, however, grant summary judgment "if the pleadings, depositions, answers

-15-

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. A "genuine" factual dispute requires the non-moving party to show more than a mere scintilla of evidence to overcome a motion for summary judgment. Id. at 252.

The court may grant summary judgment if the non-moving party's evidence is merely colorable or is not significantly probative. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

The non-movant cannot defeat a summary judgment motion simply by expressing the intent to challenge the credibility of a moving party's witness. See Kelley v. Goodyear Tire & Rubber Co., 220 F.3d at 1177 (holding that, to avoid summary judgment, the non-moving party "must supply evidence of a question of fact for the case to go to the jury). See also Coleman v. Quaker Oats Co., 232 F.3d 1271, 1289 (9th Cir. 2000)(holding that asserting that a witness' statement may be disbelieved by the jury is not sufficient to withstand summary judgment); Sattar v. Motorola, Inc., 138 F.3d 1164, 1171 (7th Cir. 1997)(holding that allowing summary judgment to be overcome by the non-movant's belief that he will be able to discredit a witness in cross-examination would render

"summary judgment itself a dead letter, rather than the essential screening device it has become for litigation today"); Thomas v. Runyon, 108 F.3d 957, 961 (8th Cir. 1997)("In order to defeat the [summary judgment] motion, plaintiff must develop some evidence or argument going beyond possible self-interest of the witness.").

## DISCRIMINATION LAW

### I.    TIME REQUIREMENTS FOR FILING DISCRIMINATION CLAIMS.

The Supreme Court, in Brown v. Gen. Servs. Admin., 425 U.S. 820 (1976), held that a federal employee must exhaust her administrative remedies before filing a judicial claim. Id. at 832. Various mandatory filings and deadlines control the administrative scheme governing complaints brought by federal employees for Title VII discrimination.[3]  For the purposes of this case, however, the important deadline is the time in which a plaintiff must initiate EEO counseling after a discriminatory event or events.

Federal employees "who believe they have been discriminated against on the basis of . . . sex" have "45 days of the date the matter alleged to be discriminatory" to initiate contact with a EEO counselor.  See 29 C.F.R. § 1614.105(a)(1).[4]  To properly exhaust administrative remedies, a plaintiff

[3]    For a thorough review of the administrative scheme governing federal employee discrimination complaints, see Phillips v. Widnall, 79 F.Supp.2d 1265, 1267-69 (D.N.M. 1999)(Mechem, J.).

[4]    The Court notes that, because West was an employee of a federal agency, the BLM, the applicable time limitation for seeking EEO counseling is within 45 days after the alleged incident,  as provided for in § 1614.105(a)(1) of the Code of Federal Regulations.  This time limitation is different than that provided for under 42 U.S.C.A. § 2000e-5, which is the time limit discussed at length in the Supreme Court decision, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 109 (discussing filing Title VII discrimination claims within the 180 or 300 day time period provided in § 2000e-5).  The Court also notes that the statutory language interpreted in Nat'l R.R. Passenger Corp. v. Morgan is different than that found in 29 C.F.R. § 1614.105(a)(1).  There is nothing in the statutory language of these two provisions, however, that indicates federal employees should be treated differently than

must comply in a timely manner with all applicable deadlines.  See Phillips v. Widnall, 79 F.Supp.2d

1265, 1268 (D.N.M. 1999)(Mechem, J.).  If a plaintiff fails to comply with the applicable deadlines,

therefore, her claim will be time barred.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 113;

Davis v. U.S. Postal Service, 934 F.Supp.2d 1210 (D. Colo. 1996)("These time limits are similar to

a statute of limitations period. An individual who has failed to comply with the administrative timing

requirements is barred from bringing an action in federal court, absent grounds for equitable tolling."),

rev'd on other grounds, 142 F.3d 1334 (10th Cir. 1998).  As discussed below, for discrete

discriminatory actions, the clock begins to run on the date the incident occurs, and a new clock starts

with every separate discriminatory incident.  See id.  For hostile work environment claims, however,

only one of the alleged incidents must occur within the 45-day filing time period.  See id. at 116-17.

The Tenth Circuit has explained the importance of the exhaustion requirement:

> Exhaustion of administrative remedies serves important policies.  The requirement
> that discrimination complaints be first presented to an agency rather than a court
> encourages informal, conciliation-oriented resolution of disputes and reduces the
> burden on federal courts. See Richerson v. Jones, 572 F.2d 89, 97 (3d Cir. 1978).  It
> is also "particularly important that the agency develop a record and have the
> opportunity to exercise its discretion, to apply its expertise, and, possibly, to discover
> and correct its own errors."  Jordan v. United States, 522 F.2d 1128, 1132 (8th Cir.
> 1975).

Sampson v. Civiletti, 632 F.2d 860 (10th Cir. 1980).

## II.    MCDONNELL DOUGLAS ANALYSIS.

In the absence of direct evidence, claims of age, race, national origin, gender discrimination,

hostile work environment, and retaliation are all subject to the burden shifting framework that the

---

state or private employees.  Even though neither party raised this issue, the Court notes that the
principles set forth under Nat'l R.R. Passenger Corp. v. Morgan apply to this case, even though this
case involves different filing time requirements and different statutory language.

Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973).

See Pastran v. K-Mart Corp., 210 F.3d 1201, 1205 (10th Cir. 2000)(noting that retaliation claims are subject to the burden shifting analysis under McDonnell Douglas). Under McDonnell Douglas, the establishment of a prima facie case of discrimination creates a presumption that the employer unlawfully discriminated or retaliated against the employee. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). This presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case. See id. at 506-507. This burden is one of production, not persuasion. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

To meet its burden, the defendant need only articulate a facially nondiscriminatory reason for its actions. The defendant is not obligated to litigate the merits of its reasoning nor does it need to prove that the reasons it relied upon were bona fide. See Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1491 (10th Cir. 1995), cert. denied, 516 U.S. 1160 (1996); EEOC v. Flasher Co., 986 F.2d 1312, 1316 (10th Cir. 1992). Once the defendant has met its burden, the presumption of unlawful discrimination drops from the case. See St. Mary's Honor Center v. Hicks, 509 U.S. at 507.

After the defendant has met its burden of producing an explanation, the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant unlawfully discriminated or retaliated against her. The plaintiff discharges that burden directly by proving that the defendant acted with discriminatory motive or indirectly by showing that the stated reason for its action was a pretext, i.e., the facially nondiscriminatory reason was a cover-up for a decision motivated by unlawful discrimination. See EEOC v. Flasher Co., 986 F.2d at 1317. "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them

unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997)(quoting <u>Olson v. General Electric Astrospace</u>, 101 F.3d 947, 951-52 (3d Cir. 1996)).

## III.    <u>DISPARATE IMPACT.</u>

To establish a prima facie case of gender discrimination, the plaintiff must establish:

> (1) that she is a member of a protected class by virtue of her gender (female) . . . (2) that she was subjected to adverse employment action; (3) that there was a disparity in the treatment afforded her in the terms and conditions of her employment as compared to that of similarly situated employees who are non-members of the protected class; and (4) that the defendant had no legitimate non-discriminatory reason for the allegedly disparate treatment, or that the stated reasons are pretextual.

<u>Dunlap v. Kan. Dept. of Health & Environ.</u>, 211 F.Supp.2d 1334, 1342 (D.Kan. 2002)(citing <u>Cole v. Ruidoso Mun. Schools</u>, 43 F.3d 1373, 1380 (10th Cir.1994)).

"Under the disparate impact theory, a plaintiff must first make out a prima facie case of discrimination by showing that 'a specific identifiable employment practice or policy caused a significant disparate impact on a protected group.'" <u>Murphy v. Derwinski</u>, 990 F.2d 540, 544 (10th Cir. 1993).  The plaintiff carries the burden of establishing she is similarly situated to her male counterparts. <u>Sorensen v. City of Aurora</u>, 984 F.2d 349, 353 (10th Cir.1993).

### A.    ADVERSE EMPLOYMENT ACTION.

Applying a liberal definition to the phrase "adverse employment action," the Tenth Circuit does not limit such actions to monetary loses.   <u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d 527, 532 (10th Cir. 1998)(citing <u>Berry v. Stevinson Chevrolet</u>; 74 F.3d 980, 986-87 (10th Cir. 1996)).  Instead, the Tenth Circuit "takes a case-by-case approach, examining the unique factors relevant to the situation at hand." <u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d at 532 (internal quotations omitted)(citing

Jeffries v. Kansas, 147 F.3d 1220, 1232 (10th Cir. 1998)).  The action, however, must be more than "'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action." Sanchez v. Denver Pub. Sch., 164 F.3d at 532 (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)).  In Sanchez v. Denver Pub. Sch., the Tenth Circuit held that a teacher's transfer between schools within the same vicinity did not constitute an adverse employment action for purpose of Title VI discrimination liability.  Sanchez v. Denver Pub. Sch., 164 F.3d at 532. In so holding, the Tenth Circuit noted that it was a purely lateral transfer in that her salary and benefits remained the same and that she continued to teach at the same level.  See id.

To be adverse, the action must "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998).  To constitute an adverse employment action, the conduct must be "'materially adverse' to the employee's job status."  Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1213 (2003)(quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 533).

In Wells v. Colo. Dep't of Transp., the Tenth Circuit addressed whether a supervisor's "poor treatment" of the employee was sufficient to establish an adverse employment action.  In that case, the plaintiff alleged that the supervisor undermined her authority at a work site when they had a disagreement in front of other workers.  In denying the plaintiff's claim that supervisor's behavior "may have been inappropriate, [the Tenth Circuit has] followed other courts in holding that 'unsubstantiated oral reprimands' and 'unnecessary derogatory comments' are not in themselves 'materially adverse employment action[s].'"  Id. at 1214 (quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 533).

-21-

The Wells v. Colo. Dep't of Transp. court also held that the decision to reassign a plaintiff to a larger, more sophisticated engineering project did not constitute an adverse employment action because "[h]er job classification and rate of pay remained the same, and her position was similar to those she had occupied in previous years." Wells v. Colo. Dep't of Transp., 325 F.3d at 1213.

In another case, Tran v. Trustees of State Colleges in Colo., 355 F.3d 1263 (10th Cir. 2004), the Tenth Circuit held that a plaintiff's transfer to two different supervisors did not constitute an adverse employment action. See id. at 1268. Noting that the transfers did not "result in a loss of employment, compensation, or benefits," the Tenth Circuit then considered the claim that the first transfer was adverse because the plaintiff was not qualified. Id. In rejecting this argument, the Tenth Circuit noted that the plaintiff's work evaluation during this period was "above standard" and "commendable." Id. (holding that requiring plaintiff to learn new skills or the possibility she could have received my training did not create an adverse change in her job responsibilities).

Unless accompanied by a material change in the plaintiff's employment's terms and conditions, an increase in workload is insufficient to establish an adverse employment action. See Mack v. Strauss, 134 F.Supp.2d 103, 113 (D.D.C. 2001)("Plaintiff's allegedly increased workload does not constitute an actionable injury because it was not accompanied by some other adverse change in the terms, conditions or privileges of employment.").

Office memoranda critiquing the employee's performance are not considered adverse material actions when the plaintiff does not "suffer any tangible consequence from th[e] memo, in the form of a loss of pay or benefits or further discipline." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1240 (11th Cir. 2001)(holding that a "counseling memorandum," as compared with the formal disciplinary procedure, that expressed concern and criticism of the employee's performance was not

an adverse employment action because the employee did not suffer any tangible consequence from the memorandum.).  But see Roberts v. Roadway Express, 149 F.3d 1098, 1104 (10th Cir. 1998)(holding that written warnings that impacted the probability an employee would be terminated are adverse employment actions).  "There is little support for the argument that negative performance evaluations alone can constitute an adverse employment action. . . . [Plaintiff] has not identified, nor have we discovered, a single case where adverse performance ratings alone were found to constitute adverse action."  Smart v. Ball State Univ., 89 F.3d 437, 442 (7th Cir.1996).

###    B.    TIMELY FILING OF CHARGE.

When alleging disparate impact based on discrete acts of discrimination, the plaintiff must file a timely charge for each act.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 114-15. According to the Supreme Court of the United States, discrete acts of discrimination constitute separate actionable "unlawful employment practice[s]," and, therefore, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."  Id. at 113-14.  If the plaintiff does not file a timely charge with respect to a discrete act, the act is time barred, "even when [the acts] are related to acts alleged in timely filed charges."  Id.  The Supreme Court noted, but did not address, that an issue of when an incident's the clock begins to run may arise when the plaintiff alleges she did not know, or should not have reasonably discovered, the discrete discriminatory act until after the alleged incident occurred.  See id. at 115 n.7.  Moreover, the Court held that "this time period for filing a charge is subject to equitable doctrines such as tolling or estoppel."  Id. at 113.  "Courts may evaluate whether it would be proper to apply such doctrines, although they are to be used sparingly."  Id..  See English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987)("Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a

cause of action.").

The Tenth Circuit has recognized that <u>Nat'l R.R. Passenger Corp. v. Morgan</u> "abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." <u>Martinez v. Potter</u>, 347 F.3d 1208, 1210 (10th Cir. 2003). Under the continuing violation doctrine, "a plaintiff may recover for discriminatory acts that occurred prior to the statutory limitations period if they are 'part of a continuing policy or practice that includes the act or acts within the statutory period.'" <u>Id.</u> at 1183 (quoting <u>Mascheroni v. Board of Regents of the Univ. of Cal.</u>, 28 F.3d 1554, 1561 (10th Cir. 1994)). <u>See</u> <u>Martin v. Nannie & the Newborns, Inc.</u>, 3 F.3d 1410, 1415 (10th Cir. 1415). Under <u>Nat'l R.R. Passenger Corp. v. Morgan</u> and <u>Davidson v. America Online, Inc.</u>, however, it is clear that the continuing violation doctrine no longer applies to alleged discrete acts of discrimination. <u>See</u> <u>Davidson v. America Online, Inc.</u>, 337 F.3d at 1184 (In <u>Nat'l R.R. Passenger Corp. v. [Morgan]</u>, the Supreme Court held that a continuing violation theory of discrimination is not permitted for claims against discrete acts of discrimination, such as termination, failure to promote, denial of transfer, or a refusal to hire.").

Untimely discrete acts of discrimination, however, may be used as background evidence to support a timely discrimination claim. <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. at 113 ("[T]he statute [does not] bar an employee from using the prior [discrete discriminatory] acts as background evidence in support of a timely claim.").

## IV.   <u>HOSTILE WORK ENVIRONMENT.</u>

Title VII prohibits an employer from discriminating against an employee with respect to

"compensation, terms, conditions, or privileges" of employment "because of such individual's . . . sex." 42 U.S.C. 2000e-2(a)(1).

### A.      PRIMA FACIE CASE OF HOSTILE WORK ENVIRONMENT.

To establish a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir.1998) (internal citations and quotations omitted).   "A discriminatory and abusive environment must affect the employee's work environment so substantially as to make it intolerable for her to continue . . . ." Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir. 1996)(holding that a work environment did not contain "pervasive" harassment when the plaintiff made general allegations of frequent "sexual slurs" and the only specific incident cited to involved a co-worker grabbing the plaintiff).   "The mere utterance of a statement which '"engenders offensive feelings in an employee' would not affect the conditions of employment to a sufficient[ly] significant degree to violate Title VII.'"   Gross v. Burggraf Construction Co., 53 F.3d 1531, 1537 (10th Cir. 1995)(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1086)(alteration in the original).

The plaintiff must also show that the discrimination occurred because of her gender.  See Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998).  "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir. 1994).

Moreover, the plaintiff must demonstrate that the work environment was objectively and

subjectively offensive, but need "not demonstrate psychological harm, nor is she required to show that her work suffered as a result of the harassment." See id. (citing Davis v. U.S. Postal Serv., 142 F.3d at 1341). Relevant considerations to determine if an environment is sufficiently objectively hostile includes, in addition to looking at all the circumstances: "[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. at 787-88 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993))(internal citations and quotations omitted).

**B.  TIME FILING REQUIREMENTS.**

The Supreme Court of the United States held that hostile work environment claims are different in kind from discrete acts. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 115. Because their very nature involves repeated conduct, the "unlawful employment practice," § 2000e-5(e)(1), cannot be said to occur on any particular day. Id. "It occurs over a series of days or perhaps years and, in contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. (citing Harris v. Forklift Systems, Inc., 510 U.S. at 21). Unlike discrete acts of discrimination, hostile work environment claims may include incidents that occurred outside of the statutory period so long as at least one of the incidents occurred within the appropriate time period. See id. at 116 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability [on a hostile work environment claim].").  Moreover, the Tenth Circuit, in explaining Nat'l R.R. Passenger Corp. v. Morgan, stated:

The Court expressly held that the date on which a plaintiff becomes aware that he or

> she has an actionable Title VII claim is of no regard in the context of determining the
> timeliness of a hostile work environment claim. Key to the Court's ruling was its
> determination that the series of acts constituting a hostile work environment
> constitute only one unlawful employment practice.

Davidson v. America Online, Inc., 337 F.3d at 1185 (citing Nat'l R.R. Passenger Corp. v. Morgan,

536 U.S. at 118)(internal citations omitted). See Boyler v. Cordant Technologies, Inc., 316 F.3d

1137, 1140 (10th Cir. 2003)("[Nat'l R.R. Passenger Corp. v. ]Morgan implicitly overruled . . . Tenth

Circuit cases to the extent the[] cases held that recovery on a Title VII hostile work environment

claim is not available for acts taken outside the statutory time period where the plaintiff knew or

should have known the conduct was discriminatory when the acts occurred.").

Provided, therefore, that an act contributing to the claim occurs within the filing period, a

court may consider the entire time period of the hostile environment for the purposes of determining

liability. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 117. That act need not be the last

act. Subsequent events may still be part of the claim, and an employee may file a charge at a later

date and still encompass the whole. See id. Therefore, a court's task is to determine whether the

acts about which an employee complains are part of the same actionable hostile work environment

practice, and if so, whether any act falls within the statutory time period.

## V.     RETALIATION.

Title VII prohibits retaliation against employees for opposing any practice that Title VII

makes unlawful or for asserting a charge, testifying, assisting or participating in any manner in an

investigation, proceeding, or hearing under Title VII. See Gunnell v. Utah Valley State Coll., 152

F.3d 1253, 1262 (10th Cir. 1998). To establish a prima facie case of retaliation, the plaintiff must

show that: (i) she engaged in an activity that Title VII protects; (ii) that the employer took an adverse

employment action against her subsequent to her protected activity; and (iii) there was a causal

connection between her participation in the protected activity and the adverse employment action that

the employer took.  See id. at 1262-63.  The Tenth Circuit recently articulated the plaintiff's burden

in establishing the causal connection element of the prima facie case:  "Plaintiff can establish the

requisite causal connection by producing 'evidence of circumstances that justify an inference of

retaliatory motive, such as protected conduct closely followed by adverse action.'"  Adams v. Wash.

Univ. of Topeka, No. 02-3071, 2003 WL 21290924, *822 (10th Cir. June 5, 2003)(quoting Burrus

v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982)).  "[U]nless the [adverse action]

is very closely connected in time to the protected activity, the plaintiff must rely on additional

evidence beyond temporal proximity to establish causation."  Anderson v. Coors Brewing Co., 181

F.3d 1171, 1179 (10th Cir. 1999)(emphasis in original).

     An isolated threat or proposal of a potentially adverse action is not, in and of itself, materially

adverse.  See Wells v. Colo. Dep't of Transp., 325 F.3d at 1214.  The threat of being written up for

insubordination is not enough to establish an adverse employment action.  See Sanchez v. Denver

Pub. Schs., 164 F.3d at 533 (holding that "unsubstantiated oral reprimands" do not constitute an

adverse employment action "absent evidence that they had some impact on the employee's

employment status.").  In support of this conclusion, the Tenth Circuit, in Sanchez v. Denver Pub.

Schs., quoted the United States Court of Appeals for the Third Circuit, which states: "[N]ot

everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even

trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form

the basis of a discrimination suit."  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1301 (3d Cir.

1997).  Even if disagreeable, if the supervisor's conduct does not significantly alter the plaintiff's

employment status, it is not an adverse employment action for the purpose of Title VII claims. Sanchez v. Denver Pub. Schs., 164 F.3d at 533.

## VI.    FARAGHER/BURLINGTON **DEFENSE**.

"Under Faragher [v. City of Boca Raton] and Burlington Indus.[, Inc. v. Ellerth], an employer whose supervisory personnel has harassed subordinates will be liable for the harassment that occurred even though the employer ultimately stopped the harassment." Gunnell v. Utah Valley State College, 152 F.3d at 1261.   When an employer faces vicarious liability for the actions of a supervisor, however, the employer may have an affirmative defense available as outlined in Faragher v. City of Boca Raton, 524 U.S. at 805-08; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998) (referred to as the "Faragher/Burlington affirmative defense").   An employer may only raise the Faragher/Burlington affirmative defense if the harassing supervisor takes "no tangible employment action" against the plaintiff employee.   See Faragher v. City of Boca Raton, 524 U.S. at 807.   Once met, the employer must establish two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."   Id.   The existence of an anti-harassment policy, while not determinative, is a factor the court may consider when deciding if the employer took reasonable efforts to prevent and correct the harassing behavior.   See id.; Gunnell v. Utah Valley State College, 152 F.3d at 1261.

<u>ANALYSIS</u>

## I.  THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON WEST'S DISPARATE TREATMENT CLAIMS.

West does not present evidence of a genuine issue of material fact whether the Defendant's discrete acts of discrimination had an unlawful disparate impact on her.  Because West relies on alleged discrete acts of discrimination to establish her claim of disparate impact, the timing in which West sought EEO counseling after each separate act is central to the Court's analysis.

West alleges seven separate occurrences to support her allegation of discrimination based on disparate impact.  The Court, however, concludes that all but one of these actions -- the Letter of Reprimand -- do not constitute adverse employment actions, and, therefore, West fails to establish a prima facie case of discrimination based on these claims.  In regard to the Letter of Reprimand, even assuming it constituted an adverse employment action, the Defendant presented sufficient nondiscriminatory reasons for issuing the letter, and West does not create a genuine issue of material fact as to pretext.  The Court, therefore, will grant the Defendant's Motion for Summary Judgment on the disparate impact claim.

### A.  DENYING REQUEST TO RELIEVE WEST'S ADDITIONAL WORKLOAD DOES NOT CONSTITUTE ADVERSE ACTION.

West alleges that she sought reprieve from the additional workload assigned to her on eight different occasions, and her supervisors denied each of these requests.  In particular, West alleges that "the repeated denial of any relief from this extraordinary workload which then led to subsequent disciplinary and other adverse action on alleged missed deadlines and other performance inadequacies which were a direct result of the increased workload."  Response at 8.

Of the eight requests for reprieve from additional workload, the 45-day limitation period set

forth in 29 C.F.R. § 1614.105(a)(1) bars all claims for denials of relief but one.[5]  The first seven

alleged denials occurred more than 45 days before West sought EEO counseling on August 16, 2001.

Because the continuing violation doctrine no longer applies to discrete acts of discrimination, the 45

day limitation period began to run for each incident on the day of its occurrence.  Although West

alleges that she was unaware that each of these acts were discriminatory, Nat'l R.R. Passenger Corp.

v. Morgan and Davidson v. America Online, Inc. indicates that, for discrete acts of discrimination,

the clock runs from the date of its occurrence.  Therefore, only the denial on August 1, 2001, is

timely under 29 C.F.R. § 1614.105(a)(1).  Because all but the last request are time barred, the Court

will only analyze whether supervisors' refusal to alleviate her additional workload constituted an

adverse employment action.

　　　Denying West's request to lift the additional workload does not constitute an adverse

employment action.  Refusal to alleviate West's workload that she originally assumed voluntarily does

not rise to the requisite level of an employment action that alters an employee's compensation or

terms of employment, or adversely affects her status as an employee.  See Wells v. Colo. Dep't of

Transp., 325 F.3d at 1213; Mack v. Strauss, 134 F.Supp.2d at 113.  Instead, the supervisors' denying

West relief from the additional workload is closer to being an inconvenience or alteration of job

responsibilities, which, under the Tenth Circuit law, does not constitute adverse employment action.

---

[5] In her response, West disputes the characterization by the Defendant that she was aware of the discriminatory effect of the repeated denials for reprieve from her workload at the time when made.  See Response ¶ 30 at 2-3.  West offers no evidence in the record, however, to support the contention that she did not know of the acts at the time they occurred.  The only evidence in the record is West's deposition testimony which, on its face, suggested she did know of the discriminatory effect of the repeated denials.  See West Depo. at 140:12-21.  Moreover, tolling of a time filing period is appropriate in certain limited circumstances, none of which are present in the record in this case.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 113.

See Sanchez v. Denver Pub. Sch., 164 F.3d at 532.

Moreover, there is no evidence in the record that West suffered an adverse employment action based on the increased workload.

West cannot, at this late date, go back in time and contend the original increase in work was an adverse action. She assumed that work voluntarily, and the result to life the work once voluntarily assumed does not constitute an adverse action. West cannot predicate her disparate impact claims on the additional workload issue.

### B.     NONE OF THE OTHER ALLEGED ACTIONS -- WITH THE EXCEPTION OF THE LETTER OF REPRIMAND -- CONSTITUTE ADVERSE ACTION.

All of the other alleged discrete acts of discrimination -- denying the trip to Spain, issuing the Letter of Concern, restricting attendance of a training conference, preventing West from attending meetings, and requiring West to submit weekly status reports -- occurred more than 45 days before West sought EEO counseling, and, therefore, are time barred under 29 C.F.R. § 1614.105(a)(1).

Even if not time barred, none of these acts are sufficiently adverse to constitute the basis of a disparate impact claim. For example, the Letter of Concern, alleged by West to be an adverse employment action, is a inter-office memorandum documenting the concerns her supervisor had, and addressed the requirements to alleviate those concerns. West offers no evidence, however, than this letter caused her any tangible loss or harm, or had any disciplinary repercussions. See Davis v. Town of Lake Park, Fla., 245 F.3d at 1240. Similarly, West does not offer any evidence to demonstrate how the travel restrictions, limitations on her attending meetings, and prohibiting her from attending a training course materially altered the terms and conditions of her employment. Because they do not constitute adverse employment actions, none of these alleged activities can support the disparate

impact claim.

**C.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT WHETHER THE NONDISCRIMINATORY REASONS FOR ISSUING THE LETTER OF REPRIMAND WERE PRETEXTUAL.**

Even assuming the Letter of Reprimand is not time barred and constitutes an adverse employment action, West does not offer evidence to create a genuine issue of material fact whether the nondiscriminatory reasons for issuing the letter were pretext.   The Defendant's offered evidence that Goff issued the Letter of Reprimand because of serious concern over West's unpaid balance on her government-issued credit card.   The only response offered by West is the unsupported assertion that her male peers who had similar outstanding balances on their government-issued credit cards did not receive such discipline.   As noted in the fact section, West did not supply the Court with evidence to support this assertion.   Even if the Court assumes this assertion to be true, however, it is still insufficient to overcome West's burden of establishing the Defendant's rationale for issuing the letter was pretextual.   There is evidence in the record that the Defendant warned her earlier about her credit card use; there is no evidence what, if anything, the Defendant had done with other employees. West's contention does not, standing alone, support her allegation that the Defendant's proferred reason is a pretext.

Moreover, assuming, *arguendo*, that the Letter of Concern constituted   an adverse employment action, West also does not present evidence to create a genuine issue of material fact as to pretext.   The Defendant explained that Johnson issued the Letter of Concern based on West's absence in the Santa Fe office, her assigned field office, and the difficulty Johnson had in contacting West on several occasions while she was out of the office.   West offers no evidence that these nondiscriminatory reasons are pretext.

-33-

Goff issued the Letter of Reprimand on August 14, 2000, and Johnson issued the Letter of Concern on January 22, 2001.  Because West did not seek EEO counseling until August 16, 2001, 29 C.F.R. § 1614.105(a)(1) bars these claims.

## II.  THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON WEST'S HOSTILE WORK ENVIRONMENT CLAIMS.

West also does not present evidence establishing a genuine issue of material fact that the Defendant's discriminated against West by subjecting her to a hostile work environment.  The actions upon which West relies -- (i) providing oral and written criticism about her to management, to peers, and during formal EPPRR sessions; and (ii) communicating with her in a manner that was often hostile, punitive, loud, and angry -- are not sufficiently hostile or abusive to constitute a hostile work environment.  As the case law from the Tenth Circuit recognizes, not all inappropriate behavior is actionable under Title VII.  See Sanchez v. Denver Pub. Schs., 164 F.3d at 533.  The actions alleged by West do not rise to the level of being intolerable, as required by Tenth Circuit law for a finding of a hostile work environment.  See Creamer v. Laidlaw Transit, Inc., 86 F.3d at 170.[6]

The time bar issue for West's hostile environment claims is different than that of the disparate impact and retaliation claims because, under Nat'l R.R. Passenger Corp. v. Morgan and Davidson v. America Online, Inc., the series of events constituted the hostile environment are considered one unlawful action.  Therefore, so long as one of the incidents occurred within the 45 time limit provided for under 29 C.F.R. § 1614.105(a)(1), other conduct that occurred outside of the proscribed time

---

[6]  The Court notes that it reaches the same conclusion even assuming all of the allegations contained in West's response to be true.  See Response at 13-14.  As mentioned throughout this opinion, West did not provide any exhibits.  West, therefore, does not support any of her allegations in the record before the Court.  But even assuming, *arguendo*, that the allegations contained in the response are true, they do not rise to the requisite level of hostility or abusiveness required for a finding of a hostile work environment claim.

-34-

period, but contributing to the hostile work environment, is not time barred.

From the record, it appears that the latest conduct that West alleges contributed to the hostile work environment occurred in May, 2001, during her mid-year EPPRR session. Because West did not seek EEO counseling within 45 days of this session, her hostile work environment claim is time barred. However, even assuming that it is not time barred (based on, for example, the August 1, 2001 meeting), the Defendants are still entitled to summary judgment because West does not offer evidence creating a genuine issue of material fact as to the hostile environment claim.

## III.   THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON WEST'S RETALIATION CLAIMS.

Because West does not present evidence establishing a genuine issue of material fact whether there was an adverse employment action, the Court will grant the Defendant's Motion for Summary Judgment on the retaliation claim. The actions on which West relies -- (i) that Whitley threatened to block her requested transfer to the Washington, D.C. office; (ii) that Johnson retaliated against her by ordering her early return from a conference in Farmington; (iii) that Whitley proposed issuing, but never filed, a letter of subordination to West; and (iv) that Johnson made disparaging remarks about West to one her prospective supervisors, Bob Ratcliff, in the Washington D.C. office -- are not adverse employment actions, and, therefore, do not create a genuine issue of material fact as to West's retaliation claim. See Wells v. Colo. Dep't of Transp., 325 F.3d at 1214; Sanchez v. Denver Pub. Schs., 164 F.3d at 533.

Ordering West to return from Santa Fe and making disparaging remarks do not constitute a material change in job responsibilities, as required under Sanchez v. City of Denver Pub. Sch. The proposed Letter of Insubordination is also insufficient because the single, unfulfilled threat is not

enough to warrant a finding of a genuine issue of material fact whether there was an adverse employment action.

## III.   THE DEFENDANT'S HAVE THE <u>FARAGHER/BURLINGTON</u> DEFENSE AVAILABLE.

Because there is no evidence establishing a genuine issue of material fact that the supervisors took any adverse or tangible employment action against West, the Defendant has the <u>Faragher</u>/<u>Burlington</u> affirmative defense available to them.   See, e.g., <u>Conatzer v. Medical Professional Bldg. Serv. Corp.</u>, No. 03-5074(10th Cir. April 13, 2004)(upholding the district court's application on a motion for summary judgment of the <u>Faragher</u>/<u>Burlington</u> defense to preclude the employer's liability).  In her response, West does not dispute the Defendant's assertion that there was a zero-tolerance policy in effect prohibiting discrimination and sexual harassment.  The BLM posted the policy throughout its offices and the policy was available to all employees.  Moreover, the BLM invested some effort into advising all employees of the required procedures for bringing a discrimination complaint.  This conduct suggests that the BLM made reasonable efforts to prevent and correct any harassing or discriminatory behavior.  In addition, West testified that she knew of the relevant procedures and policies, but chose not to pursue them until August 1, 2001.  The Court concludes, therefore, that West did not present evidence creating a genuine issue of material fact, and the Defendant has met its burden of proof as to the availability of the <u>Faragher</u>/<u>Burlington</u> defense.

Moreover, under Tenth Circuit case law, West has the burden of establishing that a genuine issue of material fact exists whether the conduct was sufficiently pervasive or abusive to support a hostile work environment claim.[7]  Based on the evidence that West offered, she did not meet this

---

[7] Even assuming that West's unsupported allegations as to Goff's treatment of her, and how this treatment compared to the male co-workers, to be true, the Court reaches the same conclusion.

significant burden and did not demonstrate a genuine issue of material fact whether the work environment was objectively hostile.  The Court, therefore, will grant the Defendant's Motion for Summary Judgment on the hostile work environment claim.

For the reasons given, the Court will grant the Defendant's Motion for Summary Judgment and deny all of West's claims.

**IT IS ORDERED** that the Defendant's Motion for Summary Judgment is granted.  The Court will dismiss the Plaintiff's claims with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Timothy L. White
Madison, Harbour, Mroz & Brennan, P.A.
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

David C. Iglesias
  United States Attorney
John W. Zavitz
Michael H. Hoses
  Assistant United States Attorneys
Albuquerque, New Mexico

    *Attorneys for the Defendants*

---

Even if West successfully submitted exhibits to support her assertions, therefore, it would not have altered the Court's analysis or decision.